# In the United States Court of Federal Claims

No. 10-538C
(Filed under seal April 15, 2011)
(Reissued May 20, 2011)

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **L-3 COMMUNICATIONS CORP.,** | * | Pre-award bid protest; Foreign |
| | * | Military Sale; sole source request; |
| Plaintiff, | * | CICA foreign government |
| | * | reimbursement exception to open |
| v. | * | competition, 10 U.S.C. |
| | * | § 2304(c)(4); guidance from |
| **THE UNITED STATES,** | * | Security Assistance Management |
| | * | Manual; justification based on |
| Defendant, | * | established history; not a gift; |
| | * | Antideficiency Act, 31 U.S.C. |
| and | * | § 1341(a)(1)(A); biased ground |
| | * | rules OCI; impaired objectivity |
| **LOCKHEED MARTIN CORP.,** | * | OCI; notice to Congress of |
| | * | proposed foreign sale. |
| Defendant-Intervenor. | * | |
| | * | |
| * * * * * * * * * * * * * * * * * * * * * * * | * | |

*Michael A. Hordell*, Pepper Hamilton LLP, Washington, D.C., for plaintiff.  *Michael R. Golden*, *Stanley R. Soya*, and *Heather Kilgore Weiner*, Pepper Hamilton LLP, all of Washington, D.C., of counsel.

*J. Hunter Bennett*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Tony West*, Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Kirk T. Manhardt*, Assistant Director, all of Washington, D.C., for defendant.  *Christopher S. Cole*, Commercial Law and Litigation Directorate, Special Litigation, Arlington, Virginia, of counsel.

*Thomas C. Papson*, McKenna Long & Aldridge LLP, Washington, D.C., for intervenor. *Allen B. Green* and *Steffen G. Jacobsen*, McKenna Long & Aldridge LLP, all of Washington, D.C., of counsel.

## <u>OPINION AND ORDER</u>

WOLSKI, Judge.

Pending before the Court are plaintiff's, defendant's, and intervenor's motions for judgment on the administrative record, filed pursuant to Rule 52.1(c) of the Rules of the United

States Court of Federal Claims ("RCFC").  For the reasons that follow, defendant's and intervenor's motions are **GRANTED** and plaintiff's motion is **DENIED**.[1]

## I.  BACKGROUND

This case deals with one portion of a $1.678 billion foreign military sale ("FMS") of F-16s and related services to Egypt.  At issue here is the procurement of flight simulators to train Egyptian pilots on use of the new F-16s.  Though a contract has not yet been awarded, Egypt has chosen, and the United States Air Force ("USAF") has accepted, Lockheed Martin Simulation, Training and Support ("LM STS" or the "simulation unit") -- a unit of defendant-intervenor Lockheed Martin Corp. ("Lockheed" or "intervenor") -- as the sole source for this requirement.  Admin. R. ("AR") at 103-14.

On September 25, 2008, Egypt submitted a letter of request to the USAF for twenty-four F-16s.  AR at 1-2.  In connection with this procurement, Egypt requested one flight simulator to train its pilots.  AR at 30.  In a May 19, 2009 sole source request, Egypt requested that several companies participate in the procurement on a sole source basis.  AR at 40-42.  Included in that list was L-3 Communications Corporation ("L-3" or "plaintiff") as the source of the simulator.  AR at 42.  The justification for this sole source request was that, in accordance with the Security Assistance Management Manual ("SAMM"),[2] "Egypt has [e]stablished a [h]istory of [p]rocurement for [a]rticles or [s]ervices from these [s]uppliers and [w]ishes to [c]ontinue for [e]quipment [s]tandardization and [c]onsequent benefits of [l]ogistics [s]upport."  AR at 42.

On July 10, 2009, LM STS submitted directly to Egypt a proposal to provide two simulators for $[XXXX], exclusive of costs added by the USAF.  AR at 91.  Included with that

---

[1]  This opinion was originally filed under seal, with the parties given the opportunity to suggest redactions.  The defendant and intervenor jointly proposed redactions, some of which (pertaining to pricing information) were accepted by the Court and others (concerning the name of an individual involved in the procurement) rejected as unjustified.  Redacted text has been replaced in the following manner:  "[XXXX]."  The opinion is released for publication, with some minor, non-substantive corrections.

[2]  The SAMM is a manual, issued pursuant to the authority of Department of Defense Directive 5105.65, that "provides guidance for the administration and implementation of Security Assistance and related activities in compliance with the Foreign Assistance Act (FAA), the Arms Export Control Act (AECA), and related statutes and directives."  Def. Sec. Corp. Agency, Dep't of Def., DoD 5105.38-M, Security Assistance Management Manual (hereinafter "SAMM") at 2 (2003) (internal reference omitted).  Security Assistance is "a group of programs, authorized by law, that allows the transfer of military articles and services to friendly foreign Governments." *Id.* at 35.  Use of the SAMM is mandatory on, among others, all organizational entities within the Department of Defense, and deviations from the SAMM must receive prior approval from the director of the Defense Security Cooperation Agency.  *Id.* at 2.

unsolicited proposal was a statement of work describing in detail all activities that LM STS would undertake as well as the technical aspects of its simulators.  AR at 337-54.

Apparently swayed by LM STS's proposal, Egypt submitted a new sole source request document on August 12, 2009.  AR at 103.  Like the May sole source request, this request listed several contractors and the portions of the procurement for which they would be responsible.  AR at 103-05.  Unlike the May sole source request, the August 12, 2009 sole source request did not include L-3 as providing the simulator; instead, LM STS was designated as providing, among other items, the simulator.  AR at 105.  While the August 12, 2009 sole source contained the same justification language as the May sole source request, AR at 105, it also said that the request was

> based on the critical need to cover Egypt defense operational requirements for the shared goals with [the United States] & to catch the production line and work load at Lockheed Martin for the new F-16 to avoid [sic] work stoppage at [Lockheed Martin] production line that will affect the price & lead time of the [aircraft] production & to ensure the continuity of production line to cover the need of [Egypt] for the [aircraft] to be delivered late 2012 up to late 2013.

AR at 103.

In addition to the August 12, 2009 sole source that named several contractors, Egypt submitted a sole source request on August 19, 2009 for only the flight simulator and named LM STS as the contractor.  AR at 106-07.  Egypt presented five explanations for this request.  AR at 107.  First, Egypt referenced the SAMM paragraphs C6.3.4 and Table C6.T2.3.[3]  *Id.*  Second,

---

[3]  SAMM paragraph C6.3.4 provides:

> Sole Source Request.  The competitive procurement process is used to the maximum extent possible when procuring articles or services.  Sole source procurement can be considered when the purchaser requests it in writing and provides sufficient rationale (DFARS 225.7304 (reference (al))).  Purchaser requests for sole source procurement using foreign sources of supply must meet the requirements in Chapter 4, paragraph C4.4.1.  Sole source requests are considered only when based on the objective needs of the purchaser.  Requests that discriminate against or exclude sources are not considered.  Some items have only a single source of supply.  A single source and a sole source are not the same thing.

SAMM at 261.  Table C6.T2 "shows some examples of justifications for sole source procurements," but the list "is not all inclusive."  *Id.* at 262.  Justification 3, the one referenced by Egypt, provides: "The country has an established history of procurement for articles or services from a particular source and a change would adversely affect an ongoing program.  An example is an ongoing maintenance program where a particular prime contractor provides

Egypt selected LM STS based on their experience and quality in providing simulators to both the USAF and other countries.  *Id.*  Third, Lockheed Martin was the original equipment manufacturer for the F-16s.  *Id.*  Fourth, LM STS was said to have considerable technical advantages.  *Id.*  And fifth, Egypt had a "[h]istory of [p]rocurement for [a]rticles or [s]ervices from Lockheed [M]artin which led to benefits of Logistics Support."  *Id.*

On October 27, 2009, the Air Force's program support manager for the Egyptian F-16 program submitted the August 12, 2009 sole source request for approval.  AR at 108-09.  No mention was made of the May 2009 or the August 19, 2009 sole source requests.  AR at 109.  That same day, the USAF Sole Source Office determined that the request met "the required criteria" from "SAMM Table C6.T2.3 and 4," and requested a "determination of legal sufficiency" from the Air Force's Materiel Command Law Office.  AR at 111.  Two days later, on October 29, 2009, an attorney-advisor from the law office responded with the determination that the August 12, 2009 sole source request was legally sufficient.  AR at 112.  Ultimately, on December 17, 2009, the August 12, 2009 sole source request received official approval.  AR at 114.

During the approval process, the USAF submitted, on October 9, 2009, to the Speaker of the House of Representatives a report describing the proposed sale to Egypt of the F-16s.  AR at 95-102.  The notification listed major defense equipment, such as the planes themselves and spare engines, and non-major defense equipment, such as GPS and fuel tanks.  AR at 96-97.  Under a listing of "[a]lso included" items was "personnel training and training equipment."  AR at 97.  The notice also identified individual companies involved with the proposed sale.  AR at 99.  Included in that list was LM STS (listed as Fort Worth, Texas) and L-3 (listed as Arlington, Texas).  *Id.*

On December 24, 2009, after sending the notice to Congress and receiving internal approval for the sole sources, the USAF and Egypt entered into a Letter of Offer and Acceptance ("LOA").  AR at 115.  The LOA contains several references to LM STS as the sole source of a simulator.  AR at 125, 143-44, 172.  While the first page of the LOA refers to this procurement as an "FMS Credit (Non-Repayable)" sale, AR at 115, the LOA contains provisions obligating Egypt to pay the total cost of the procurement, even if it exceeds the estimate, AR at 177.  To help in financial planning, the LOA provides a schedule of payments detailing the payment amounts and dates to cover the entire cost of the procurement.  AR at 129-30.  On June 24, 2010, the USAF and Egypt amended the LOA to make changes in some of the non-simulator line items.  AR at 313-329.  The amendment left the payment schedule largely intact.  AR at 314.  The one change was that instead of showing an initial deposit of $[XXXX], AR at 129, it showed an amount received from purchaser of $[XXXX] and an amount due with the amendment of $[XXXX].  AR at 322.

---

technical assistance or other services under established agreements."  *Id.*

In the period between the signing of the LOA and the amendment, there was some discussion regarding the quantity of simulators that Egypt wanted. On January 6, 2010, a senior manager at LM STS emailed a lieutenant colonel at the USAF "to make sure there [wa]s no confusion" regarding LM STS's offer to Egypt. AR at 203-04. The simulator unit "assumed it was clear that the simulator line item included two simulators." AR at 204. The company was, however, receiving conflicting information on the number expected. *Id.* The USAF lieutenant colonel first responded that the LOA indeed said one simulator, but the dollar amount covers two simulators. AR at 203. The number of simulators, he said, would be corrected in the then-forthcoming amendment. *Id.* More than three months after his initial response, the lieutenant colonel emailed the LM STS senior manager on April 21, 2010 that he had provided "some erroneous information." AR at 202. He now said that two simulators were never discussed with Egypt and that one simulator was reflected in all the documentation. *Id.* The simulator unit responded that it had committed to providing two simulators, and its consultant informed it that Egypt was expecting two. AR at 201. On April 22, 2010, the USAF lieutenant colonel expressed some concern and surprise that LM STS had contacted Egypt directly and not gone through the USAF. *Id.* He also said that when the two simulators were first mentioned, "[he] thought perhaps that LM STS had offered [Egypt] the second simulator as a concession to seal the deal," which "would not be included in the LOA." *Id.* He then responded that the way forward would in part be determined by the cost -- if there were enough money to cover two simulators, and Egypt expressed an interest to USAF for having a second, then they could amend the LOA. *Id.* If, however, there were not enough money on the simulator line item, then there would be a problem "because the total program value cannot increase." *Id.*

Over the following week, the USAF continued discussing internally the issue of the number of simulators being purchased. AR at 198-201. One USAF employee said that someone at Lockheed Martin had "set this up." AR at 201. The lieutenant colonel said that, after talking with the senior manager at LM STS, the second simulator "was never intended to be a concession." AR at 200. He did think that there was enough money in the simulator line item to cover two simulators, and it would just be a matter of confirming whether Egypt really wanted two and then amending the LOA. *Id.* Another USAF employee chimed in that before they could amend the LOA or make a commitment to Egypt on price, USAF would have to rework the numbers. *Id.* At this point, one of the USAF employees emailed her Egyptian contact to clarify the number of simulators Egypt wanted. AR at 197, 199, 205. The Egyptian contact said that "it is only one full mission simulator, the LOA is wright [sic]." AR at 205. This was apparently the end of the quantity issue until the kickoff meeting held May 23-25, 2010. AR at 207. At this meeting, Egypt apparently requested that a second simulator be added to the procurement and the LOA be amended to reflect that. AR at 215, 220, 243, 252.

On August 10, 2010, L-3 filed its Verified Complaint for Declaratory Judgment, Preliminary and Permanent Injunctive Relief ("Complaint"). In the Complaint, plaintiff presented four counts, alleging that: (1) the sole source to LM STS violated statutes and regulations, Compl. ¶¶ 36-42; (2) LM STS gave Egypt an improper gift of a second simulator, *id.* ¶¶ 43-50; (3) the notice sent to Congress was defective, *id.* ¶¶ 51-57; and (4) the sole source was

tainted by an unmitigated organizational conflict of interest ("OCI") on the part of Lockheed Martin and LM STS. *Id.* ¶¶ 58-61. Plaintiff requested that this Court enjoin the sole source to LM STS, direct the USAF to hold a competition for the requirement, and prohibit LM STS from competing for the award. *Id.* at 14-15. All three parties filed motions for judgment on the administrative record, and a hearing on the motions was held. After a careful consideration of the administrative record, the papers submitted and the arguments of counsel, this opinion follows.

## II. DISCUSSION

### A. Jurisdiction

Defendant and intervenor have not challenged the Court's jurisdiction to hear this case. A court, however, has an obligation to satisfy itself that jurisdiction is proper, even when the parties do not challenge it. *Hertz Corp. v. Friend*, 130 S. Ct. 1181, 1193 (2010).

The Tucker Act, as amended by the Administrative Dispute Resolution Act of 1996, Pub. L. No. 104-320, § 12(a), 110 Stat. 3870, 3874-75 (1996), permits the Court to hear, among other things, challenges alleging a "violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(b)(1) (2006). Here, plaintiff has sufficiently alleged violations of several statutes and regulations in connection with the proposed sole source award to LM STS, including 10 U.S.C. § 2304(c)(4), 22 U.S.C. § 2776, and DFARS § 225.7304. *See generally* Pl.'s Mot. J. on Admin. R. ("Pl.'s Br.").

In addition to alleging a violation of a statute or regulation, a plaintiff must qualify as an "interested party" under the Tucker Act. 28 U.S.C. § 1491(b)(1). Looking to the Competition in Contracting Act ("CICA"), the Federal Circuit has held that an "interested party" is an "actual or prospective bidder[] or offeror[] whose direct economic interest would be affected by the award of the contract or by failure to award the contract." *Am. Fed'n of Gov't Emps., AFL-CIO v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001). In the post-award context, a protestor must show that "but for" the alleged errors, it would have had a substantial chance of receiving the award. *Labatt Food Serv., Inc. v. United States*, 577 F.3d 1375, 1380 (Fed. Cir. 2009); *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003). In the pre-award context, however, the substantial chance test does not easily apply. Therefore, the Federal Circuit has held that in that context, a protestor must show that it suffered a "non-trivial competitive injury which can be addressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1362 (Fed. Cir. 2009). In order to determine prejudice, the Court must assume all of plaintiff's well-pled allegations are true and then determine whether all the allegations taken together cross the necessary threshold -- either depriving plaintiff of a substantial chance of award or inflicting non-trivial competitive injury. *USFalcon v. United States*, 92 Fed. Cl. 436, 450 (2010).

This case is more akin to a pre-award bid protest since the solicitation for LM STS's sole source contract has not yet issued.  Decl. of Amy D. Redick ¶ 3 (Sept. 28, 2010) (attached to Def.'s Mot. J. on Admin. R.).[4]  Accordingly, in order to establish prejudice and hence standing, plaintiff must, taking its well-pled allegations as true, demonstrate a non-trivial competitive injury.  L-3 has made such a showing.  Plaintiff alleges that the government has violated CICA and internal guidelines by precluding L-3 from receiving or competing for the award.  If true, plaintiff would have gone from being the presumptive sole source, *see* AR at 42, to being precluded from even competing for an award.  This certainly is a non-trivial competitive injury.[5]  Satisfied that plaintiff has standing and the Court has jurisdiction, the Court now turns to the merits of plaintiff's allegations.

**B.  Standards of Review**

The Tucker Act requires the Court in all bid protest cases to use the standards of review set forth in the Administrative Procedure Act ("APA").  28 U.S.C. § 1491(b)(4).  The Federal Circuit has decided that "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A)."  *Banknote Corp. of Am., Inc. v. United States*, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  This section of the APA provides that the reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Put simply, the Court must determine whether the agency lacked a rational basis for its action, or whether it violated any statutes or regulations.  *Banknote Corp.*, 365 F.3d at 1351; *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001).  A reviewing court is not permitted to substitute its own judgment for that of the agency, even if it would have come to a different decision than the agency.  *See, e.g.*, *Ala. Aircraft Indus., Inc. - Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009); *Weeks Marine*, 575 F.3d at 1371; *Pitney Bowes Gov't Solutions, Inc. v. United States*, 94 Fed. Cl. 1, 6 (2010).

Even if a plaintiff overcomes this high hurdle, success may yet elude it.  Once a plaintiff has shown an arbitrary or unlawful act, it must demonstrate prejudice.  *E.g.*, *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed. Cir. 1996); *Galen Med. Assocs., Inc. v. United States*, 369

---

[4]  Although the Redick Declaration is not part of the administrative record, it is part of the Court's record and may be used to establish a jurisdictional fact.  *See PlanetSpace, Inc. v. United States*, 90 Fed. Cl. 1, 5 (2009).

[5]  The Court notes that plaintiff would also have satisfied the substantial chance test for prejudice.  Plaintiff alleges that it has historically provided flight simulators to Egypt, Compl. ¶ 15; that it provided approximately 80% of the F-16 simulators worldwide, *id.* ¶ 16; that it has thus far provided all of the flight simulators for the latest F-16 engine version worldwide, *id.*; and that it was the original choice by Egypt to receive the award.  *See id.* ¶ 19.  If plaintiff's allegations that a competition is required are correct, then it has shown it would have had a substantial chance of receiving the resulting award.

F.3d 1324, 1330 (Fed. Cir. 2004).  This second prejudice determination employs the same standards as the prejudice determination for purposes of standing, discussed above.  The difference between the two is that the prejudice determination for purposes of standing assumes all non-frivolous allegations to be true, whereas the post-merits prejudice determination is based only on those allegations which have been proven true.  *USFalcon*, 92 Fed. Cl. at 450.  After a plaintiff succeeds on the merits and demonstrates prejudice the question of relief is addressed.

## C.  Was the Sole Source Request Proper Under CICA?

Plaintiff first alleges that USAF's decision to approve LM STS as the sole source of the simulator portion of the sale to Egypt was a violation of CICA, specifically 10 U.S.C. § 2304(a).  Unless one of the exceptions applies, section 2304(a) requires an agency to "obtain full and open competition through the use of competitive procedures."  10 U.S.C. § 2304(a)(1)(A).  The relevant exception at issue here is 10 U.S.C. § 2304(c)(4), which provides:

> The head of an agency may use procedures other than competitive procedures only when:
> . . .
> (4) the terms of an international agreement or a treaty between the United States and a foreign government or international organization, or the written directions of a foreign government reimbursing the agency for the cost of the procurement of the property or services for such government, have the effect of requiring the use of procedures other than competitive procedures; . . . .

10 U.S.C. § 2304(c).  While the parties agree that this is the exception at issue, they disagree as to its applicability.

Plaintiff argues that the plain language of the statute precludes Egypt from directing USAF to award a sole source contract to LM STS.  Pl.'s Br. at 14-15.  It contends that *Egypt* is not "reimbursing the agency" because the source of the funds to be used are United States funds, and not funds from Egypt's treasury.  *Id.*; Pl.'s Resp. to Def.'s and Intervenor's Mots. J. on AR ("Pl.'s Reply") at 6-7.  Instead of using its own funds, Egypt is using "FMS Credit (Non-Repayable)," as per the Terms of Sale of the Letter of Offer and Acceptance.  Pl.'s Br. at 15 n.7; *see* AR at 115.  L-3 also argues that regardless of the source of the funds, as soon as they are put into a FMS Trust Account, they become funds of the United States.  Pl.'s Reply at 6-9.  Therefore, it contends, any procurement using funds from a FMS Trust Account would not be subject to the section 2304(c)(4) exception and would have to use competitive procedures.  *Id.*  From a policy perspective, L-3 argues that the strong presumption in CICA in favor of competition should be followed because it will ensure that the taxpayers' money is well-spent.  Pl.'s Br. at 13-16.

Defendant and Lockheed argue that this procurement falls within the § 2304(c)(4) exception.  Mot. J. upon AR ("Def.'s Br.") at 23-28; Intervenor's Mot. J. on AR ("Intervenor's

Br.") at 25-29.  Chiefly, the government and intervenor make three arguments to support this contention.  First, they argue that under the terms of the LOA, Egypt is required to make payments for the entire cost of the procurement in accordance with the payment schedule.  Def.'s Br. at 20, 24-25 (citing AR at 129-30, 322-23); Intervenor's Br. at 26 n.17.  The source of those funds does not change Egypt's status as a reimbursing country, particularly when the plain language of the statute requires reimbursement to the agency, not the United States.  Def.'s Br. at 24-27; Intervenor's Br. at 26-29.  Second, they argue that while these funds initially come from the United States, they are essentially Egypt's.  According to the government and Lockheed, Egypt can use the funds for whatever procurements it desires; any unspent funds do not revert to the United States; and Egypt must pay any portion of a procurement that exceeds the available funds.  Def.'s Br. at 23-24, 27-28; Intervenor's Reply to Pl.'s Br. at ("Intervenor's Reply") at 8.  Third, the government argues that requiring Egypt, or any foreign nation, to use competitive procedures could strain relations between that nation and the United States.  Def.'s Br. at 28.

In interpreting any statute, the Court looks to the plain language to determine its meaning. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." (citation and quotation omitted)).  If the text is clear, the Court's role is to enforce the text unless it produces an absurd result.  *Id.* at 296-97; *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1, 6 (2000).

The main contention between the parties is whether Egypt qualifies as a "foreign government reimbursing the agency."  10 U.S.C. § 2304(c)(4).  To the Court, the plain meaning of § 2304(c)(4) supports defendant's and LM STS's view.[6]  Congress chose to exempt foreign governments reimbursing *the agency*.  Congress could have chosen to exempt only those governments reimbursing the United States -- i.e., those governments using entirely non-United States funds -- but it did not.  Since the statute says "reimbursing the agency" and not "reimbursing the United States," as long as Egypt pays the USAF, it can qualify as a "foreign government reimbursing the agency" under section 2304(c)(4).  This conclusion is bolstered by the fact that section 2304(c)(4) also does not distinguish between the source of the funds used for reimbursement -- Congress did not say that the foreign government was required to reimburse the agency with its own funds.  This is the approach followed by the Government Accountability

---

[6]  During oral argument, plaintiff's counsel stated that there was no legislative history discussing this exception.  Tr. of Hr'g at 17.  For what it is worth, there is legislative history dealing with this exception, which suggests that the statute was codifying exceptions to full and open competition that had been recognized by what was then called the General Accounting Office, now known as the Government Accountability Office ("GAO").  H.R. Rep. No. 98-861, at 1425 (1984) (Conf. Rep.), *reprinted in* 1984 U.S.C.C.A.N. 1445, 2113.  A review of pre-1984 GAO opinions shows that when GAO took jurisdiction over these matters, it  would allow the foreign government to direct a sole source.  *See, e.g.*, *Allied Repair Serv., Inc.*, 62 Comp. Gen. 100 (1982); *Aerosonic Corp.*, B-176571, 1972 WL 6213 (Comp. Gen. Oct. 20, 1972); *Gulf Aerospace Corp.*, B-167209, 1969 WL 3650 (Comp. Gen. Sept. 3, 1969).

Office, which applies the exception even when grants or forgiven loans from the United States are the source of the funds used by the foreign nation. *See, e.g.*, *Goddard Indus., Inc.*, B-275643, 97-1 CPD ¶ 104 (Comp. Gen. Mar. 11, 1997)*; Optic-Elec. Corp.*, B-235885, 89-2 CPD ¶ 326 (Comp. Gen. Oct. 6, 1989); *Int'l Logistics Grp., Ltd.*, B-214676, 84-2 CPD ¶ 314 (Comp. Gen. Sept. 18, 1984).

Here, Egypt is paying USAF for the costs incurred in the procurement. According to the LOA, Egypt must make timely payments even if they exceed the amounts estimated. AR at 177. The LOA had an estimated payment schedule which required an initial deposit of over $[XXXX] and repayment of the balance starting in June 2010 and ending in December 2015. AR at 129-30. Approximately six months after the LOA was signed, the parties amended the LOA. AR at 115, 313. That amendment also contained an estimated repayment schedule. AR at 322-23. One difference between the two schedules is that the one in the amendment lists over $123 million as already received from Egypt, reflecting the initial deposit required by the LOA. AR at 322. This shows that Egypt has already started paying for the goods and services it has received. It is clear to the Court that Egypt, which is required to pay for the entirety of the costs and has already started paying, is reimbursing the USAF.[7]

In order to invoke the exception to competitive procedures under § 2304(c)(4), a foreign government reimbursing the agency must provide "written directions . . . [that] have the effect of requiring the use of procedures other than competitive procedures." 10 U.S.C. § 2304(c)(4). Here, Egypt several times requested that LM STS be the sole source for the simulator portion of the procurement. AR at 105, 106-07, 125-26, 172. At the least, the August 12, 2009 request was submitted for approval and approved by the USAF. AR at 108-14. Egypt has met the requirements to qualify for the § 2304(c)(4) exception from open and competitive procedures, and the USAF's decision to allow LM STS to be the sole source of the simulator portion of the procurement is, therefore, not unlawful.

**D.  Was the SAMM Violated?**

Plaintiff argues that, even if Egypt's sole source request falls under the 10 U.S.C. § 2304(c)(4) exception, the USAF did not follow mandatory regulations in granting the request.

---

[7]  L-3 relies on False Claims Act cases, holding that funds transferred into an FMS account are U.S. funds for purposes of that act, in arguing that the section 2304(c)(4) exception does not apply to FMS program purchases. *See* Pl.'s Reply at 6-9 (citing, *inter alia*, *United States ex rel. Hayes v. CMC Electronics, Inc.*, 297 F. Supp. 2d 734, 739 (D.N.J. 2003); *United States ex rel. Campbell v. Lockheed Martin Corp.*, 282 F. Supp. 2d 1324, 1338 (M.D. Fla. 2003)). But whether the False Claims Act applies to the funds has nothing to do with the question of whether a foreign government is reimbursing an agency by using FMS accounts, and plaintiff's interpretation would drain the exception of all meaning -- as even money coming from a foreign government's own funds could not be used to make a sole source purchase through the FMS program, since the funds would be deposited in the FMS account in the process.

Pl.'s Br. at 16-22.  L-3 first quotes a provision from the Defense Federal Acquisition Regulation Supplement ("DFARS") concerning FMS purchases.  *Id.* at 17.  The full sentence quoted reads: "The contracting officer shall honor such requests from the FMS customer only if the LOA or other written direction sufficiently fulfills the requirements of FAR Subpart 6.3."  48 C.F.R. § 225.7304(a).  But for plaintiff's purposes, there are two problems with this provision.  First, the words "such requests" seem to be referencing the subject of the sentence immediately preceding, which concerned the "request that a *subcontract* be placed with a particular firm."  *Id.* (emphasis added).  For prime contracts, such as this procurement would involve, the provision merely states that "[i]n such cases, FAR 6.302-4 provides authority to contract without full and open competition."  *Id.*

This brings us to the second problem, which is that FAR Subpart 6.3 mostly concerns the other categories of exceptions to full and open competition, and the formal justification and approval process that is used for them, but from which foreign government reimbursed purchases are exempt.  *See* 48 C.F.R. §§ 6.302-1 to .302-3, 6.302-5 to .302-7, 6.303 to .305; 10 U.S.C. § 2304(f)(2)(E) (exempting subsection (c)(4) procurements); 48 C.F.R. § 6.302-4(c) (exempting Department of Defense contracts).[8]  The FAR provision concerning the procurement at issue, section 6.302-4, essentially mirrors the language from 10 U.S.C. § 2304(c)(4) concerning when "other than competitive procedures" may be used.  *Compare* 10 U.S.C. § 2304(c)(4) *with* 48 C.F.R. § 6.302-4(a).  Having determined above that section 2304(c)(4) applies to this procurement, the directive from FAR Subpart 6.3 to use full and open competition cannot be violated since the same language allowing an exception from competition in section 2304(c)(4) is used in Subpart 6.3.  Without a violation of FAR Subpart 6.3, the USAF's approval of the sole source does not violate DFARS section 225.7304.

This is not the end of the matter, however.  Although the DFARS provision in question notes that FAR section 6.302-4 "provides authority to contract without full and open competition" when a foreign government requests a particular contractor, 48 C.F.R. § 225.7304, and the FAR provision referenced states that "[f]ull and open competition need not be provided for" in these circumstances and that the authority to allow non-competitive contracting "may be used," 48 C.F.R. § 6.302-4(a)(2), (b), one supposes the Department of Defense could still limit the authority of subordinate officers to approve this dispensation.  After all, "need not" and "must not" are two different things.  The Security Assistance Management Manual contains a provision concerning FMS acquisitions which cites DFARS section 225.7304 for its authority and states that "[s]ole source procurement can be considered when the purchaser requests it in writing and provides sufficient rationale."  SAMM ¶ C6.3.4.  Another provision explains that a foreign official must submit a letter to "provide the basis and justification for the sole source request,"

---

[8]  In the place of the justification and approval process, when the procurement involves "the written directions of a foreign government reimbursing the agency for the cost of the procurement," 10 U.S.C. § 2304(c)(4), the law merely requires that "the head of the contracting activity prepare[] a document in connection with such procurement that describes . . . the written directions."  10 U.S.C. § 2304(f)(2)(E).

and refers to a list of possible justifications that "is not all inclusive." *Id.* ¶ C.6.3.4.3 (citing Table C6.T2). L-3 contends that the agency's approval of the sole source request was arbitrary in light of these mandatory guidelines.

Specifically, plaintiff argues that the SAMM requires an agency to use competition as much as possible and to accept sole source requests only when they clearly identify objective needs that justify the departure from competition. Pl.'s Br. at 17-18. Here, L-3 argues, Egypt's justification is factually inaccurate and actually leads to the conclusion that L-3, not LM STS, should be awarded the sole source. *Id.* at 18. Egypt uses the SAMM Table C6.T2.3[9] justification to support the sole source request -- which concerns a history with a particular contractor and the problems caused by changing to a new source -- but L-3 contends that it, not LM STS, has been providing Egypt with simulators, and that LM STS has yet to provide anyone with these particular simulators. *Id.* at 18-20. Another justification that Egypt uses -- that not granting the sole sources would result in delay of delivery of the F-16s -- is also inapplicable, according to L-3, since the simulators have no bearing on the production of the planes. *Id.* at 18. Egypt also chose LM STS based on supposed technical superiority. *Id.* at 19 (citing AR at 107). Plaintiff, however, has access to the same data that LM STS has, and has sold simulators with those technical aspects worldwide. *Id.* at 19-21. The USAF, plaintiff alleges, was aware of these inaccuracies in Egypt's justifications yet still granted the sole source request. *Id.*

Defendant and intervenor, on the other hand, argue that the SAMM provides only internal guidance and cannot be the basis for a valid protest. Def.'s Br. at 29-30; Intervenor's Br. at 33-34. They contend that the Department of Defense did not intend for the SAMM to be binding and did not use the proper (notice and comment) procedures to enact the SAMM as a binding regulation. Def.'s Br. at 31-33; Intervenor's Br. at 34-37. Therefore, they argue, the SAMM does not confer rights on the public and a violation of it does not create an actionable right for an offeror. Def.'s Br. at 29; Intervenor's Br. at 35.

Moreover, both the government and Lockheed argue, even if the SAMM had the force and effect of law, there was no violation here. Def.'s Br. at 35-39; Intervenor's Br. at 37-40. First, they contend, the sole source requests provided sufficient rationale based on Egypt's objective needs and that nation did not discriminate against or exclude possible sources. Def.'s Br. at 35-38; Intervenor's Br. at 37-39. Egypt has positive past experience with Lockheed, which is the original equipment manufacturer for the F-16s, and using that experience to prefer LM STS is not unreasonable, defendant and intervenor argue. Def.'s Br. at 35-37; Intervenor's Br. at 38-39. Second, the government and Lockheed contend that both L-3 and LM STS informally competed for the sole source and Egypt chose LM STS as the winner. Def.'s Br. at 38-39; Intervenor's Br. at 39-40. Justification 4 from the SAMM Table C6.T2 provides that a foreign competition is sufficient reason to allow a sole source. SAMM at 262. Finally, defendant speculates that since Egypt has experience with L-3 as a simulator provider, the country must have chosen LM STS due to dissatisfaction with plaintiff. Def.'s Br. at 37-39.

---

[9] *See supra* note 3.

It may well be the case that the government and Lockheed are correct in their argument that the SAMM is not a binding regulation, the prejudicial violation of which can always be the basis of a bid protest. But L-3 does not seem to be arguing that the approval of the sole source request was a clear violation of a regulation, but rather that the decision was arbitrary when viewed in the context of the SAMM procedures, which the Air Force purported to be following. As the Court has explained in the context of source selection plans, which are internal restraints that agencies are free to change, there can be circumstances in which a final decision is made on the incorrect assumption that requirements in the plan were followed by subordinates. *See USFalcon*, 92 Fed. Cl. at 452-55; *Fort Carson Support Servs. v. United States*, 71 Fed. Cl. 571, 592-93, 599 (2006). Since the predicate to the decision is false, in these circumstances the ultimate decision could thus be found arbitrary. *USFalcon*, 92 Fed. Cl. at 452-54. Plaintiff contends something similar happened here. *See* Pl.'s Reply at 15-16.

The Court views the SAMM as similar to a source selection plan. The foreword to the SAMM states that it "is mandatory for use by all the [Department of Defense] Components." SAMM at 2. A subordinate (i.e., someone other than the person making the ultimate decision) does not have authority to deviate from the SAMM. Therefore, if a Department of Defense employee did deviate from the SAMM without the requisite approval, that deviation may be the basis for a determination that an action based on that deviation was arbitrary. Additionally, both Egypt and the Department of Defense personnel repeatedly said their requests and decisions were in accordance with the SAMM. *See, e.g.*, AR at 40, 42, 103, 105, 106, 108, 111, 114. The final approval of the sole source request was in the form of a very brief memorandum which identified the request and stated that the "[Materiel Command Law Office] and the Sole Source Office have determined that this request meets the required criteria outlined in DOD 5105.38-M, SAMM Table C6.T2.3 and 4 and recommend approval." AR at 114. No attachment is noted on the memorandum, at the bottom of which approval was noted by a brigadier general. Thus, the final approval rested on the representation that the SAMM criteria were met. If the brigadier general and the other Department of Defense personnel were mistaken in their belief that the sole source request comported with the SAMM, the Court cannot presume that they would have approved the request had they realized their mistake. The Court must therefore turn to the question of whether the SAMM was followed.

As an initial matter, both defendant and intervenor refer to and analyze the August 19, 2009 sole source request. The Court will not. While directed specifically to the simulator requirement, that request was not included in either the request for approval of the sole source or the approval itself. AR at 109, 111, 112, 114. Since only the August 12, 2009 sole source request was included in the approval and the approval requests, that is the only sole source request the Court will consider.

The August 12, 2009 sole source request begins by saying that the request is in accordance with the SAMM "Chapter 6, Section C6.3, paragraph C6.3.4, Table C6.T2.3." AR at 103. The request then says it is "based on the critical need" to obtain defense equipment and to prevent work stoppages at Lockheed Martin, which would result in higher price and later

delivery.  *Id.*  The request lists several contractors, including LM STS, and their corresponding portions of the procurement, and it concludes with a statement that the "[j]ustifications for this sole source request is [sic] per the (SAMM) [sic] as Egypt has established a good history of procurement & service from this supplier & need [sic] to continue standardizations for F-16 Blk 50/52 & consequent benefits of logistics support over 30 years."  AR at 105.

Similarly, during the approval process, the USAF referenced the SAMM several times.  The request for approval of the sole source request stated that the program support manager "determined that this request for sole source meets the criteria of SAMM Table C6.T2.3 and 4."  AR at 108.  Review for legal sufficiency was also sought.  AR at 111.  The request for legal review stated that there had already been a determination by the Sole Source Office that the sole source request met the criteria in SAMM Table C6.T2.3 and 4.  *Id.*  Without mentioning the SAMM, the attorney-advisor responded that the sole source request was legally sufficient.  AR at 112.  And, as was noted above, the document that the brigadier general signed approving the sole source request also mentioned that the request had been determined to comply with SAMM Table C6.T2.3 and 4.  AR at 114.

Section C6.3.4 of the SAMM provides:

> The competitive procurement process is used to the maximum extent possible when procuring articles or services.  Sole source procurement can be considered when the purchaser requests it in writing and provides sufficient rationale . . . .  Sole source requests are considered only when based on the objective needs of the purchaser.  Requests that discriminate against or exclude sources are not considered. . . .

SAMM at 261.  Table C6.T2 presents a description of five possible sole source justifications, though the list is not exclusive.  *Id.* at 262.  Two of the five, justifications 3 and 4, were cited in the various approval documents.  Justification 3 provides that "[t]he country has an established history of procurement for articles or services from a particular source and a change would adversely affect an ongoing program.  An example is an ongoing maintenance program where a particular prime contractor provides technical assistance or other services under established agreements."  *Id.*  Justification 4 provides that:

> The designated source has won the foreign purchaser's own source selection competition.  A copy of the country's request for proposal, invitation for bid, or request for tender; a description of the method used to advertise the requirement and any restrictions placed thereon; and a narrative summary of the country's source selection criteria and method of evaluation should be included with the sole source request.  If price is not the sole selection criteria, the country must identify the weight that was given to each criterion.

*Id.*

-14-

Defendant and intervenor both labor to explain how the record supports the notion that L-3 and LM STS were engaged in a competition to provide the simulator, consistent with justification 4. *See* Def.'s Br. at 38-39; Intervenor's Br. at 39-40. But from a close review of the administrative record, it is clear that the "foreign purchaser's own source selection competition" that this justification refers to had nothing to do with the selection of the simulator, but instead concerned the selection of Raytheon's Electronic Warfare ("EW") system. *See* AR at 108 (Program Support Manager's memorandum, describing that two companies were considered, and that the selection of Raytheon was based on a committee's review and on evaluation parameters selected by the Egyptian Air Force), 113 (Sole Source Office routed summary sheet, describing the two companies competing to provide the EW system, the review parameters and the committee selection). A separate document that was not included in the administrative record, "attachment four" to the Egyptian request, *see* AR at 108, contained the information regarding the selection of Raytheon, and presumably rested on justification 4.

As was noted above, the sole source request that contained LM STS and was considered by the Air Force cited SAMM Table C6.T2.3, not C6.T2.4. *See* AR at 103. The request listed vendors which it described as the "[original equipment manufacturers] of the F-16 program," and stated that "[t]o go [to] other vendors would adversely affect the continuity and expedient support the EAF has previously received from these vendors." *Id*. It concluded by noting "a good history of procurement & service from" the identified suppliers, the "need to continue standardizations . . . & consequent benefits of logistics support over 30 years." AR at 105. Justification 3 from the table is not based solely on "an established history of procurement for articles or services from a particular source," but continues with the words: "and a change would adversely affect an ongoing program." SAMM at 262. Can this, as plaintiff argues, be the basis for a court's determination that a sole source approval was arbitrary, since investigation by the Air Force could have revealed that L-3, not LM STS, was the traditional supplier of Egypt's flight simulators?

The Court concludes to the contrary. If the sole source approvals had cited only justification 4, which was not given as the basis for the Egyptian request and seems to have nothing to do with the list containing LM STS, the decision would seem to conflict with objective information contained in the record and would rest on a finding which requires information that was, in fact, absent. But unlike justification 4, there is no requirement in the SAMM that the foreign government produce any evidence supporting justification 3. Nor is there any mandate that Department of Defense personnel investigate a foreign government's assertions. Here, the written request from Egypt contained assertions that were consistent with the justification 3 language, and thus the Air Force's acceptance does not involve a deviation from the SAMM.[10]

---

[10] These assertions, it should be noted, referred not just to LM STS, but also to nine other listed vendors, which were to provide over two dozen different items. *See* AR at 103-04.

Moreover, justification 3 does not say that the established history with the contractor must relate to the specific article or service at issue in the present solicitation.  SAMM at 262. And even if the reference to "a change" that "would adversely affect an ongoing program" might be read to limit the justification to previously provided articles or services, the table represents "possible sole source justifications" and is described as "not all inclusive."  In the absence of specific requirements such as those associated with justification 4, the Court will not presume that the Air Force cannot approve a request which contains a justification that departs somewhat from the "possible" ones on the table.  Thus, the layers of approvals leading to the final sole source decision do not involve the sort of "mandatory instructions" that prove problematic in the context of source selection plans.  *See USfalcon*, 92 Fed. Cl. at 454.  No arbitrary action under the SAMM has been established.

### E.  Did LM STS's Offer of Two Simulators Constitute an Improper Gift?

Plaintiff contends that LM STS marred the integrity of the procurement process by improperly offering Egypt a "buy one, get one free" deal.  Pl.'s Br. at 28-29. To support this contention, L-3 makes several arguments.  First, it argues that Egypt had, until the May 2010 kickoff meeting, only indicated a need for one simulator.  *Id.* 29; Pl.'s Reply at 20-21.  When the USAF discovered LM STS's offer for two simulators, the USAF reacted with surprise and assumed that the second simulator was a concession to seal the deal.  Pl.'s Br. at 30; Pl.'s Reply at 21-22.  Second, L-3 alleges, as above, that all the funds being used are United States funds. Pl.'s Br. at 29-30.  As such, anything that would push the amount of the procurement over the original appropriated amount, as adding a second simulator allegedly would, is not permitted.  *Id.* at 30-32.  Relatedly, it argues that an agency is not permitted to accept a gift if that would essentially increase a procurement above the original appropriated amount. *Id.*

The Court finds plaintiff's support, and ultimately its arguments, unavailing.  First and foremost, plaintiff does not provide any evidence that the second simulator was truly a gift -- that is, a no-cost add-on to LM STS's offer.  There is no evidence in the record that LM STS made an offer of one simulator and then decided to throw in a second at no additional cost.  Instead, LM STS's unsolicited proposal to Egypt from the beginning included "[p]rovision of two Full Mission Simulators" at a combined cost of $[XXXX].  AR at 91.  Plaintiff's counsel, when asked at oral argument, could not provide an answer for how one could distinguish between a gift and a discount.  Tr. of Hr'g at 73.  The other evidence L-3 points to -- the email from a USAF representative who says he "thought perhaps that [LM STS] had offered [Egypt] the second simulator as a concession to seal the deal," AR at 201 -- is pure speculation.  Moreover, a fair reading of the email suggests that this was his initial speculation, and as he received more information, he realized it was not a concession.  AR at 200.

Even assuming that the second simulator was a no-cost gift to Egypt, plaintiff's arguments fail to persuade.  The authority L-3 points to, and the arguments it makes, revolve around concerns that a United States agency could receive more money than Congress

appropriated.[11]  Egypt, however, is not a United States agency and Congress does not control the amount of defense goods and services that Egypt can receive, let alone the gifts it can receive.  Moreover, Egypt, unlike a United States agency, has its own, non-appropriated funds from which it is obligated under the LOA to pay for any cost overruns.  AR at 177.  Thus, the proposed sale does not violate the Antideficiency Act.  *See* 31 U.S.C. § 1341(a)(1)(A).

## F.  Do Organizational Conflicts of Interest Invalidate the Sole Source Selection?

Plaintiff argues that OCIs render improper the decision to use LM STS as the sole source of flight simulators.  Plaintiff claims that this procurement suffered from both a ground rules OCI and an impaired objectivity OCI.  Pl.'s Br. at 27-28.  To support this claim, L-3 argues that Egypt originally, and continually, only wanted one simulator.  *Id.* 22-26.  Unbeknownst to the United States government, Lockheed Martin then forced Egypt to accept a second simulator as a gift to seal the deal and switch its sole source request from L-3 to LM STS, its affiliate.  *Id.*  Lockheed Martin was able to apply such pressure to Egypt by "raising the self-serving specter" that if Egypt did not choose LM STS over L-3 there would be delays in delivery of the entire procurement.  *Id.* 26.  Lockheed Martin then provided the statement of work for Egypt to use in its request for simulators.  *Id.* 27.  And finally, Lockheed Martin used its position as the original equipment manufacturer of the F-16s to promote and evaluate LM STS, ultimately giving them the sole source.  *Id.* 27-28.

Generally, there are three types of OCIs -- resulting from unequal access to information, biased ground rules, and impaired objectivity.  *Turner Constr. Co., Inc. v. United States*, 94 Fed. Cl. 561, 568 (2010).  Plaintiff only alleges the latter two types here.  Briefly, the biased ground rules OCI occurs "where a firm, due to its work on one government contract, has 'set the ground rules' for another government contract." *Id.* at 569 (citation omitted).  The impaired objectivity OCI occurs "where a firm's work under one contract might require it to evaluate itself under another contract."  *Id.*; *see also Ala. Aircraft Indus., Inc. - Birmingham v. United States*, 83 Fed. Cl. 666, 687-88 (2008) *rev'd on other grounds*, 586 F.3d 1372 (Fed. Cir. 2009).  An OCI must be shown by "hard facts" -- inference and suspicion are insufficient.  *PAI Corp. v. United States*, 614 F.3d 1347, 1352 (Fed. Cir. 2010).  If an OCI is present, the contracting officer is required to avoid or mitigate the conflict.  48 C.F.R. § 9.504(a).

---

[11]  Plaintiff cites *Motor Coach Indus., Inc. v. Dole*, 725 F.2d 958 (4th Cir. 1984); *Denali Comm'n -- Authority to Receive Grants*, B-319246, 2010 WL 3507303 (Comp. Gen. Sept. 1, 2010); *Nat'l Inst. Of Envtl. Health Scis. -- Am. Chemistry Council Donation*, B-303689, 2005 WL 2431251 (Comp. Gen. Sept. 30, 2005); *SBA's Imposition of Oversight Review Fees on PLP Lenders*, B-300248, 2004 WL 77861 (Comp. Gen. Jan. 15, 2004); *Carrier-Provided Computers for Electronically Filing Tariffs with the Interstate Commerce Comm'n*, 70 Comp. Gen. 597 (1991); *Customs Serv. -- Reimbursement for Additional Personnel at Miami Int'l Airport*, 59 Comp. Gen. 294 (1980); *Nat'l Park Revenues -- Disposition*, 25 Comp. Gen. 637 (1946).

As an initial matter, it is not clear to the Court that these OCI rules would even apply in a case such as this where a foreign government, and not a United States agency, is making the decision. But assuming they do apply, plaintiff has not sufficiently demonstrated the existence of any OCI. For the ground rules OCI, plaintiff argues that Lockheed Martin used its status as the sole source of Egypt's F-16s to develop a statement of work, which Egypt ultimately adopted, that favored LM STS. Pl.'s Br. at 27. For the impaired objectivity OCI, plaintiff argues that Lockheed Martin used its position to pressure Egypt into choosing LM STS for the simulators. *Id.* 27-28. It appears to the Court that plaintiff's evidence for these claims is conjecture. Assuming, however, that plaintiff were correct in its factual allegations, no OCI would result. The key ingredient, which plaintiff misses, of both of the OCIs is a contractor holding an official position with regard to the procurement at issue and using that position to give itself a competitive advantage. Neither Lockheed Martin nor LM STS was in an official position with regard to the sole source determination for the simulators. Neither has a contract with Egypt, or the USAF, to assist in the drafting of the solicitations. Nor does either have a contract with Egypt, or the USAF, to evaluate proposals received in response to the solicitations. Instead, LM STS submitted to Egypt an unsolicited proposal for its simulators that included a detailed statement of work. AR at 91, 337-54. As plaintiff admitted at oral argument, any contractor was free to contact Egypt and submit an unsolicited proposal that included a statement of work. Tr. of Hr'g 50-52. In fact, L-3 has submitted an unsolicited proposal to Egypt for its simulators. AR at 379. There is nothing untoward about this, and Egypt having selected LM STS's statement of work does not demonstrate a ground rules OCI.

Similarly, there is nothing unlawful, if true, about Lockheed Martin putting pressure on Egypt to choose LM STS for the simulators. The primary evidence that L-3 uses to demonstrate this pressure is the August 12, 2009 sole source request, AR at 103, and the Egypt trip report, AR at 334. Tr. of Hr'g 52-63. L-3 uses these two pieces of the record to argue that Lockheed Martin threatened Egypt with delays and increased costs on the F-16s if Egypt did not choose LM STS for the simulators. *Id.* The Court finds this argument to be based on inference and loosely, at best, to support plaintiff's claim. The August 12, 2009 sole source request is a request for sole sources from many different companies providing what appears to be parts for actual use on the F-16s. AR at 103-05. The LM STS unit is listed, but the simulators appear to be an afterthought. AR at 104-05. The Egypt trip report makes no mention of the simulators. AR at 333-34. The report only says that "Lockheed Martin is now claiming that they must have a signed LOA from Egypt by the end of Aug[.] 09 to avoid layoffs at their Fort Worth facility." AR at 334. The more natural reading of the sole source request and the Egypt trip report is that Lockheed Martin was concerned that a delay while competition was held to supply the components of the F-16s would delay delivery and increase overall costs. Further, any such delay could necessitate a round of lay-offs at Lockheed Martin. It does not appear to the Court that such pressure was motivated by Lockheed Martin's desire to attain a sole source for LM STS to provide the simulators. In fact, it appears to the Court that the same rationale would apply and nothing would change in the August 12, 2009 sole source if L-3 had been listed as the simulator sole source instead of LM STS.

Moreover, the Court finds it puzzling that L-3 is arguing that, on the one hand, the second simulator was being given away for free, while, on the other hand, the simulator sale was crucial to Lockheed.  Assuming, however, that Lockheed Martin did exert pressure on Egypt, an impaired objectivity OCI does not result.  Plaintiff has pointed to no law or regulation that would prevent a contractor, not acting in an official capacity for the government, from promoting a subsidiary.  Plaintiff has provided no evidence that Lockheed Martin had the responsibility of evaluating proposals for Egypt.  Instead, Lockheed Martin was simply cross-promoting another company in its corporate family, much the same way a uniform provider might also try to sell shoes to customers as well.  *See* Tr. of Hr'g 61-62.  If anything, Lockheed Martin was simply bargaining from a position of strength.  Absent some law or regulation prohibiting this cross-promotion or any evidence demonstrating Lockheed Martin was acting in an official capacity in doing so, the Court cannot find an impaired objectivity OCI associated with this matter.

## G.  Was the Notice to Congress Deficient?

Lastly, L-3 challenges the sufficiency of the notice sent to Congress regarding the particulars of the procurement.  Plaintiff argues that the notice was improper and "effectively insulat[ed] Congress and the public from knowledge of the improprieties associated with the simulator award to Lockheed Martin."  Pl.'s Br. at 33.  Looking to 22 U.S.C. § 2776, plaintiff asserts that the required congressional notice for this procurement must include all gifts being offered to Egypt as well as a description of the defense articles and a list of all expected contractors.  Pl.'s Br. at 34.  Congress then has thirty days to review the notice and enact a joint resolution, if it chooses, to block the proposed procurement.  *Id.*  These provisions, according to plaintiff, are "self-evidently designed to allow Congress time to consider all aspects of the foreign military sale."  *Id.*

Plaintiff claims that the notice submitted to Congress is improper for three reasons.  First, plaintiff argues that the notice identified L-3 located in Arlington, Texas as a possible contractor.  *Id.* at 34-35.  The only division of L-3 in Arlington, Texas is the division that makes the simulators.  *Id.*  Conversely, the notice did not identify the Orlando, Florida division of Lockheed Martin, which is the division that makes its simulators.  *Id.*  As a result, Congress "would have reasonably assumed" L-3 was providing simulators, when at that point LM STS had already been designated the sole source.  *Id.* at 35.  Second, L-3 argues that the notice was devoid of a meaningful description of the simulators.  *Id.*  A lack of such a description, it contends, served to hide from the public and Congress LM STS's offer of two simulators instead of the requested one.  *Id.*  And third, L-3 asserts that the notice was defective because it did not mention the gift, as required by law, of a second simulator that LM STS allegedly made to Egypt.  *Id.*  Congress was therefore unaware that Egypt made its selection decision not on quality, but on the receipt of the alleged gift from LM STS.  *Id.*  Defendant and LM STS contend that the notice was proper, and that, moreover, L-3 cannot show that any of the alleged errors actually prejudiced it.  Def.'s Br. at 43-47; Intervenor's Br. at 43-46.

Plaintiff's arguments are not persuasive. Plaintiff's first argument ignores a key word in the statute and the posture of the procurement on the date of the notice. While normally the obligation to name each contractor arises "upon the request of such committee or the Committee on Foreign Affairs of the House of Representatives," the Court will assume, *arguendo*, that since the USAF undertook to name the contractors, that it must fully comply with the provisions of 22 U.S.C. § 2776(b)(1)(C). A close look, however, reveals that the USAF did in fact comply with the statute. Section 2776(b)(1)(C) only requires the agency to name "each contractor *expected* to provide the defense article, defense service, or design and construction service." 22 U.S.C. § 2776(b)(1)(C) (emphasis added). The notice lists the date of delivery to Congress as October 9, 2009. AR at 95, 97. At that time, Egypt had submitted sole source requests for LM STS, AR at 103, 106 (showing source requests from Egypt dated August 12, 2009 and August 19, 2009), but neither had been approved, AR at 114 (showing requests were approved on December 17, 2009). In fact, as of the date of the notice, requests to approve the sole source selection of LM STS had not yet been submitted. AR at 108, 111 (showing requests for approval dated October 27, 2009). Because the LM STS sole source selection had not been approved at that point, and because L-3 was originally identified as the sole source of the simulator, *see* AR at 42, it was not improper for the USAF to include both LM STS and L-3 in its notice as expected contractors.

As defendant and intervenor point out, plaintiff's second argument contradicts its first. Def.'s Br. at 45-46; Intervenor's Br. at 45-46. In the first argument, plaintiff asserts that Congress would see L-3 located in Arlington, Texas and assume it was supplying simulators, but its second argument asserts that the simulators were not described by the notice. Taking the second argument as an alternative to the first, plaintiff is still incorrect. Section 2776(b)(1) only requires a detailed description upon request of a Congressional committee. 22 U.S.C. § 2776(b)(1)(A). There is no evidence in the record that a request for more detailed descriptions was made. Instead, USAF undertook to describe in detail the major defense equipment and to include less detailed descriptions of the non-major defense equipment. Included in the non-major defense equipment were generalized categories, including "personnel training and training equipment." AR at 97-98. The Court finds that this description clearly encompassed the simulators, and if Congress had wanted more detail on them, it could have requested a more detailed statement under § 2776(b)(1).[12] Absent such a request, the Court does not find the inclusion of the simulators under a generic description to be improper.

Plaintiff's third argument fails because, as detailed above, the Court found that LM STS's offer of a second simulator was not a gift or a concession, but rather was an offer to sell two simulators at a given price. *See supra* Part II-E. Since the second simulator was not a gift, the USAF was under no obligation to notify Congress to the contrary.

---

[12] The Court also notes that using a generic description of "training equipment" also comports with the guidance provided by the SAMM. *See* SAMM at 250.

### III.  CONCLUSION

For the foregoing reasons, the Court finds that the Air Force's approval of Egypt's selection of a sole source for flight simulators was neither unlawful nor arbitrary.  Accordingly, plaintiff's motion for judgment on the administrative record is **DENIED**, and defendant's and intervenor's motions for judgment on the administrative record are **GRANTED**.  The Clerk of the Court is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Victor J. Wolski                              
**VICTOR J. WOLSKI**
Judge